IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| **DOUBLE DIAMOND PROPERTIES, L.L.C.,** : <br> **and CYPRESS POINT CITGO, INC.,** : <br> **t/a BAYSIDE BP** : <br> : <br> **Plaintiffs,** : <br> : <br> v. : <br> : <br> **AMOCO OIL COMPANY and BP PRODUCTS** : <br> **NORTH AMERICA INC.,** : <br> : <br> **Defendants.** : | Civil Action No. 2:06cv226 |

## OPINION

Plaintiffs Double Diamond Properties, LLC ("Double Diamond") and Cypress Point Citgo, Inc. ("Cypress Point") own and operate, respectively, a gasoline station located at 4904 Haygood Road in Virginia Beach, Virginia (the "Haygood Station"). The Haygood Station is subject to a restrictive covenant that prohibits until September 2011 the sale of any petroleum products not originally supplied by defendant BP Products North America, Inc., formerly known as Amoco Oil Company ("BP"). BP currently supplies the Haygood Station indirectly through one of its jobbers[1], Miller

---

[1]A jobber is "a wholesaler who operates on a small scale or who sells only to retailers and institutions." Merriam-Webster Online Dictionary, http://209.161.37.11/dictionary/jobber (last visited February 5, 2007). For the purposes of this Opinion and Order, jobbers distribute gasoline from BP, the branded supply

1

Oil Co. ("Miller Oil").

Plaintiffs seek to invalidate the Restrictive Covenant. Alternatively, they seek an injunction directing BP to allow one of its other jobbers, PAPCO, Inc., to supply BP-branded gasoline to the Haygood Station. Because the Restrictive Covenant is enforceable and does not restrict the manner in which BP interacts with the distributors of its branded products, the Court has previously entered an Order granting BP's Motion for Summary Judgment and denying plaintiffs' Cross-Motion for Partial Summary Judgment. This Opinion explains the Court's reasoning.

## I.  Factual and Procedural History[2]

### A.  Canal's Purchase of the Haygood Station

The Haygood Station was originally owned and operated by BP. In 2001, BP began to divest its real estate holdings in Southeastern Virginia as part of a long-term strategy to discontinue direct supply and operation of retail gasoline stations. In furtherance of this strategy, BP offered to sell

---

source, to retail dealers.

[2] Because the Court grants defendant BP's motion for summary judgment, the Court will state the necessary facts, and the inferences reasonably drawn from those facts, in the light most favorable to Double Diamond, the nonmoving party and plaintiff in the present case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir. 1995).

the Haygood Station to Canal Enterprises, L.L.C. ("Canal"), a retail gasoline dealer. BP offered Canal the following purchase options: 1) a market price of $835,000 free from any restriction; or 2) a discounted price of $642,000 subject to both a ten year Restrictive Covenant and a Dealer Supply Agreement (the "Canal Supply Agreement"). Canal chose the second option and purchased the Haygood Station on September 11, 2001.

The Restrictive Covenant set forth in the Special Warranty Deed states, in pertinent part:

> The Grantee[, Canal,] herein covenants and agrees, for itself, and its heirs, executors, grantees, successors and assigns, that no part of the real estate herein conveyed shall be used . . . for the purpose of conducting or carrying on the business of selling, handling, or dealing in gasoline . . . or any fuel used for internal combustion engines, or lubricants in any form; <u>unless the items sold, handled or dealt in are supplied, either directly or indirectly, from the Grantor[, BP]</u>. This restriction binds and restricts the property as a covenant running with the land and <u>is deemed to benefit Grantor[, BP]</u> as an owner or lessee of lands in the City of Portsmouth, Virginia metropolitan area or <u>as the operator or supplier of retail operations in the City of Portsmouth, Virginia metropolitan area</u>. Except as otherwise provided herein, this restrictive covenant will remain in full force and effect for a term of ten (10) years from the date of this conveyance, whereupon this restrictive covenant will automatically lapse and terminate and be of no further force or effect. If Grantor discontinues supplying gasoline to Grantee or an Affiliate (as herein defined) of Grantee, or their respective heirs, executors grantees, successors or assigns (unless such discontinuation is a result of the action of Grantee or an Affiliate of Grantee), <u>on a direct or indirect basis for a period of thirty (30) or more consecutive days</u> during such ten (10) year term then, within thirty (30) days after receipt of Grantee's written request thereof, Grantor, at Grantor's sole option, shall either recommence supplying gasoline or terminate the foregoing restrictive covenant.

(Docket No. 32, Exhibit 2 at 1-2) (emphasis added). The Canal

Supply Agreement has a five year term and is renewable for an additional five years at BP's option. The Canal Supply Agreement does not prohibit BP from assigning its supply rights[3], and grants to BP a right of first refusal in the event Canal attempts to sell the Haygood Station.

### B. Method of Gasoline Distribution

In 2005, BP converted its wholesale gasoline distribution business in southeastern Virginia from a direct-serve market (selling gasoline directly to retail merchants) to an indirect-serve market. The latter method of distribution relies upon local jobbers to purchase BP-branded gasoline and transport it from the refinery pipeline to retail dealer locations. The jobbers who distribute BP-branded gasoline do so pursuant to jobber agreements with the company.

On October 14, 2005, Miller Oil agreed to become the exclusive distributor of BP-branded fuel to twenty-four (24) specific dealer locations. The Haygood Station was one of the twenty-four locations assigned to Miller Oil. In exchange for these exclusive supply rights, Miller Oil paid BP the sum of $1,411,000 (the allocated cost for the Haygood Station was $28,603) and agreed not to distribute BP-branded fuels to any

---

[3] Virginia law provides "that in the absence of an express provision against assignment of a contract not involving personal skill, trust, or confidence, the contract is freely assignable." Johnson v. Ferris, 58 Va. Cir. 7, 12 (Fairfax Cir. Ct. 2001) (Stitt, J.) (citing J. Maury Dove Co. v. New River Coal, 150 Va. 796, 827, 143 S.E. 317, 327 (1928)).

4

locations other than those listed in the parties' agreement. BP sold distribution rights for other locations to PAPCO and additional local jobbers.

### C. Double Diamond's Purchase of the Haygood Station

When Canal negotiated the purchase of the Haygood Station, it consulted with Mr. James W. Thomas ("Mr. Thomas"). Mr. Thomas is the owner of J. W. Thomas, Inc, an accounting and bookkeeping firm in Norfolk, Virginia that specializes in the petroleum industry. At the time of the Canal purchase, Mr. Thomas represented approximately twenty (20) other dealers who also purchased BP retail stations. In addition to his accounting and bookkeeping business, Mr. Thomas indirectly owns three gasoline stations that PAPCO supplies with non-BP gasoline.

After the purchase from BP, Canal developed financial problems and ultimately closed the Haygood Station in 2004. Canal, which was indebted to Mr. Thomas for previous accounting services, requested that Mr. Thomas assist in selling the station. After a year of unsuccessful efforts, Mr. Thomas decided to purchase the station himself. He did so through plaintiff Double Diamond, which is a limited liability company that he controls.

On October 24, 2005, Mr. Thomas, on behalf of plaintiff Double Diamond, executed a Purchase Agreement to acquire the Haygood Station from Canal for $945,000, a purchase price below the Haygood Station's appraised value of $1,308,000. The


Purchase Agreement contained two relevant contingencies inserted by Mr. Thomas:

> 1) "BUYER MUST BE APPROVED BY BP/AMOCO – MILLER OIL COMPANY;" and 2) "CONTRACT IS CONTINGENT UPON BUYER MEETING WITH MILLER OIL COMPANY AND OBTAINING SATISFACTORY SUPPLY AGREEMENT."

(Docket No. 32, Ex. 9, p. 3).

On November 4, 2005, Mr. Thomas faxed a copy of the Purchase Agreement to Miller Oil and requested that the jobber decline to exercise its option so that Double Diamond could proceed.[4] By letter dated November 10, 2005, Miller Oil waived its right of first refusal contingent upon: "(i) approval by Miller of the Buyer and the Buyer's financial creditworthiness, and (ii) the agreement and execution by Miller and Buyer of a satisfactory Supply Agreement."  (Pl. Ex. 7).

Miller Oil approved Double Diamond's credit application, and the principals of the two companies met on November 18, 2005 to discuss pricing terms.  At the meeting, Miller Oil offered Double Diamond the following pricing options: 1) assumption of the existing Canal Supply Agreement; or 2) a new supply agreement with the same cost-plus pricing option that Miller Oil offers to the other retail dealers it supplies.  Mr. Thomas disliked both options and terminated the negotiations.

Although it had no supply agreement in place and no assurance of a future supply agreement, Double Diamond closed its

---

[4] When BP assigned the Canal Supply Agreement, Miller Oil acquired BP's Right of First Refusal.

purchase of the Haygood Station on January 25, 2006. Despite the documents discussed above, Mr. Thomas contends that he did not know at the time of purchase that Miller held the exclusive right to supply petroleum products to the Haygood Station. Six days after closing, Double Diamond asked PAPCO to supply the Haygood Station with BP-branded gasoline on the same terms and conditions that PAPCO offers to the three other stations that Mr. Thomas indirectly owns. PAPCO initially expressed interest in such an arrangement, but ultimately declined Double Diamond's request after discovering that Miller Oil had purchased exclusive rights to supply the Haygood Station.

Plaintiffs filed this action to preliminarily and permanently enjoin enforcement of the Restrictive Covenant or, in the alternative, to compel BP to allow PAPCO to supply the Haygood Station with BP-branded gasoline. The Court denied plaintiffs' Motion for a Preliminary Injunction. (Docket No. 18). Double Diamond's operating affiliate, plaintiff Cypress Point, thereafter assumed the Canal Supply Agreement and currently sells at the Haygood Station BP-branded fuel supplied by Miller Oil. Plaintiffs contend that they could purchase BP-branded petroleum products at a substantially cheaper price from PAPCO.

## II. Principles of Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] Fed. R. Civ. P. 56(c); see also Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); March v. Ohio Cas. Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006); Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 449 (4th Cir. 2004). Summary judgment is an appropriate disposition when the plaintiff is unable to prevail on his or her claims as a matter of law. Beall, 130 F.3d at 619; Evans, 80 F.3d at 958-59.

## III. Analysis

Virginia recognizes two types of restrictive covenants: "the common law doctrine of covenants running with the land and

---

[5] Because the principles of summary judgment are well-established, further elucidation of those principles need not be provided here. See Garrow v. Economos Props., Inc., 406 F. Supp. 2d 635, 638-39 (E.D. Va. 2005) (providing detailed description of summary judgment principles); Taylor v. Wal-Mart Stores, Inc., 376 F. Supp. 2d 653, 657-58 (E.D. Va. 2005) (same); Puckett v. City of Portsmouth, 391 F. Supp. 2d 423, 430-31 (E.D. Va. 2005) (same).

8

restrictive covenants in equity known as equitable easements and equitable servitudes." Sloan v. Johnson, 254 Va. 271, 274-75, 491 S.E.2d 725, 727 (1997); accord Sonoma Dev., Inc. v. Miller, 258 Va. 163, 167, 515 S.E.2d 577, 579 (1999). Restrictive covenants running with the land, also referred to as "real covenants," arise when, as here, the deed specifies restrictions that affect "the use of land that run[s] to the benefit or burden of remote successors in interest to the land." Sonoma Dev., 258 Va. at 167 n.2, 515 S.E.2d at 579 n.2.

The Virginia Supreme Court has summarized the principles utilized to interpret restrictive covenants as follows:

> Valid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains. Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of free use of the property.

Waynesboro Village, L.L.C. v. B.M.C. Props., 255 Va. 75, 80, 496 S.E.2d 64, 67-68 (citations omitted) (quoting Friedberg v. Riverpoint Bldg. Comm., 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977)). Despite these well established cautions, a court applying Virginia law must enforce the bargain if it is clear after reading the entire instrument that the parties "with their eyes open" and for valuable consideration intended that a certain thing not be done on the property. Sonoma Dev., 258 Va. at 169, 515 S.E.2d at 581; Bauer v. Harn, 223 Va. 31, 39, 286 S.E.2d 192, 196 (1982).

9

Plaintiffs argue that their operation of the Haygood Station is not subject to the Restrictive Covenant in the Special Warranty Deed for three reasons: 1) the restriction does not run with the land because it no longer benefits BP; 2) the Restrictive Covenant terminated by operation of law when BP refused to allow PAPCO to supply BP-branded fuel to the Haygood Station; and 3) BP's conversion from direct-supply to jobber-supply was such a significant change that it destroyed the objects and purposes of the restriction.  Each will be discussed in turn.

    A.   <u>Does BP Still Benefit From The Restrictive Covenant?</u>

To be enforceable against subsequent purchasers, the party seeking to enforce a restrictive covenant must prove:

> (1) privity between the original parties to the covenant (horizontal privity); (2) privity between the original parties and their successors in interest (vertical privity); (3) an intent by the original covenanting parties that the benefits and burdens of the covenant will run with the land; (4) that the covenant 'touches and concerns' the land; and (5) the covenant must be in writing.

<u>Sonoma Dev.</u>, 258 Va. at 167, 515 S.E.2d at 579 (footnote omitted) (<u>citing</u> <u>Sloan</u>, 254 Va. at 276, 491 S.E.2d at 728).  Plaintiffs assert that BP cannot satisfy the third element of this test.

Plaintiffs base their argument on the benefit clause of the Restrictive Covenant.  That clause states, in pertinent part, that the restriction benefits BP "as the operator or supplier of retail operations."  As plaintiffs interpret this language, the

10

term "supplier of retail operations" limits BP's benefit to that of a <u>direct</u> supplier of retail operations.  They argue that once BP sold its direct-serve rights to Miller Oil, it no longer qualified as a "supplier of retail operations" who benefits from the deed restriction.

Restrictive covenants are construed "from language used in the light of the circumstances under which they were written." <u>Traylor v. Holloway</u>, 206 Va. 257, 260, 142 S.E.2d 521, 523 (1965); <u>accord</u> <u>Bauer</u>, 223 Va. at 37, 286 S.E.2d at 195.  "'[W]hen the language of a deed is 'clear, unambiguous, and explicit,' a court interpreting it 'should look no further than the four corners of the instrument under review.'" <u>Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth.</u>, 270 Va. 309, 315, 618 S.E.2d 323, 326 (2005) (<u>quoting</u> <u>Utsch v. Utsch</u>, 266 Va. 124, 129, 581 S.E.2d 507, 509 (2003)).  Moreover, "'the construction [of a contract] adopted should be reasonable, and absurd results are to be avoided.'" <u>Providence Square Assocs., L.L.C. v. G.D.F. Inc.</u>, 211 F.3d 846, 852 (4th Cir. 2000) (<u>quoting</u> <u>Transit Cas. Co. v. Hartman's, Inc.</u>, 218 Va. 703, 708, 239 S.E.2d 894, 896 (1978)).

Plaintiffs see ambiguity where none exists.  They rely only on that sentence of the Restrictive Covenant that describes the benefit conferred upon BP without considering the preceding sentence which prohibits the sale of gasoline and petroleum products on the premises for ten years "unless the items sold, handled or dealt in are supplied, <u>either directly or indirectly</u>, from [BP]."  (Docket. No. 32, Ex. 2 at 1) (emphasis added).  When

11

the two sentences are read together, it is quite clear that the term "supplier of retail operations", means either a direct or an indirect supplier. This construction of the term is supported by the expiration provision of the Restrictive Covenant which specifies that the restriction terminates if BP stops selling gasoline "on a <u>direct or indirect</u> basis for a period of thirty (30) or more consecutive days . . . ." To construe the term "supplier of retail operations" as only a "direct" supplier would render superfluous the "directly or indirectly" language that BP and Canal included in their agreement. See Templeman v. Steptoe, 15 Va. (1 Munf.) 339, 367 (1810) ("It is a sound rule of construction that, if it can be prevented, no clause, sentence, or word, shall be rendered superfluous, void, or insignificant.").

Even if the term "supplier of retail operations" were ambiguous, consideration of the circumstances surrounding the creation of the Restrictive Covenant would lead to the same interpretation. BP clearly intended to retain until 2011 the right to supply its branded petroleum products at the retail stations it sold in 2001. BP sold the Haygood Station at a discounted price expressly in exchange for a ten year Restrictive Covenant and an assignable Supply Agreement. That BP now originates the sale of its branded petroleum products two steps (rather than one step) up the chain of distribution is of no moment. The fundamental basis of the parties' bargain remains the same — BP refines and supplies the petroleum products that

12

are sold to the public at the Haygood Station.

### B. Does the Restrictive Covenant Prohibit Miller Oil's Exclusive Distributorship?

Plaintiffs assert that they can honor the Restrictive Covenant by selling BP-branded petroleum products distributed by any of BP's jobbers, including PAPCO.  Plaintiffs rely on that portion of the Special Warranty Deed which prohibits the sale of any petroleum products "unless the items sold . . . are supplied, either directly or indirectly, from [BP]."  (Docket No. 32, Ex. 2 at 1) (emphasis added).  Because the Restrictive Covenant does not expressly allow BP to require that its products be resold to the Haygood Station by a particular jobber, plaintiffs assert that BP impermissibly expanded the covenant when it prohibited PAPCO from selling to the Haygood Station.

The short answer to plaintiffs' argument is that BP did not need an affirmative grant of authority either to impose a customer resale restriction on PAPCO or to sell to Miller Oil the exclusive right to supply petroleum products to the Haygood Station.  A manufacturer who acts unilaterally generally is free to deal (or not) with whoever it wishes on whatever terms it wishes. Tidmore Oil Co., Inc. v. BP Oil Co., 932 F.2d 1384, 1388-89 (11th Cir. 1991); Official Airlines Guides, Inc. v. FTC, 630 F.2d 920, 925-27 (2d Cir. 1981).  This is a right recognized at common law.  See generally William Litwin, The English Common Law Concerning Monopolies, 21 U. Chi. L. Rev. 355 (1954).  In the

13

absence of market power[6] or a specialty statute[7], a manufacturer legally may restrict the parties to whom its customers resell the manufacturer's goods, Sports Center, Inc. v. Riddell, Inc., 673 F.2d 786, 791 (5th Cir. 1982), and may designate a particular distributor to be the manufacturer's exclusive reseller to a particular location or in a specific geographic area, Ryko Mfg. Co. v. Eden Services, 823 F.2d 1215, 1231 (8th Cir. 1987). Neither circumstance is present in this case.

    C.    <u>Have Circumstances So Changed As To Invalidate The Restrictive Covenant?</u>

A court may invalidate a restrictive covenant if conditions surrounding the property change to so great a degree as to destroy the covenant's purpose. Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith, 264 Va. 350, 356-57, 568 S.E2d 676,

---

[6] Market power, which is sometimes referred to as monopoly power, is the ability to raise prices above levels that would be charged in a competitive market. Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc., 889 F.2d 524, 528 n.8 (4th Cir. 1989). A finding that the defendant manufacturer lacks market power obviates the need to assess the alleged anticompetitive effects of a non-price vertical restraint. Assam Drug Co. v. Miller Brewing Co., 798 F.2d 311, 316 (8th Cir. 1986). Stated alternatively, a non-price vertical restraint imposed by a seller who lacks market power cannot harm competition. See generally Legal Aspects of Selling and Buying § 5:3 (Phillip F. Zeidman ed.,3d ed. 2006).

[7] For example, the Petroleum Marketing Practices Act, 15 U.S.C. § 2802 et seq., restricts the actions that refiners and marketers can take vis-a-vis petroleum retailers. The Virginia Petroleum Products Franchise Act, Va. Code § 59.1-21.8 et seq., imposes additional restrictions on refiners and marketers selling petroleum products in the Commonwealth of Virginia. Neither statute prohibits customer resale restrictions or exclusive distributorships.

680 (2002). Although there is "[n]o hard and fast rule" as to the amount of change necessary to defeat the purpose of the restrictions, "it can be safely asserted [that] the changes must be so radical as practically to destroy the essential objects and purposes of the agreement." Booker v. Old Dominion Land Co., 188 Va. 143, 148, 49 S.E.2d 314, 317 (1948) (quotations omitted).

The "radical" degree of change necessary to invalidate an otherwise permissible restrictive covenant is illustrated by the Virginia Supreme Court's decision in Chesterfield Meadows, 264 Va. at 352-53, 568 S.E.2d at 677-78. The restrictive covenant in that case prohibited commercial development of a parcel of land located adjacent to a historic structure. The former owner imposed the restrictive covenant expressly for the purpose of preserving the integrity of the historic area. Several years after the restriction was recorded, the historical structure was moved to a new location. The land upon which the historic structure sat was re-zoned for commercial use and soon contained a shopping center and fast-food restaurant. Other surrounding properties also converted from bucolic to commercial uses. The Virginia Supreme Court held that the commercial transformation of the area rendered null and void the original purpose of the restriction. Id., 264 Va. at 356, 568 S.E.2d at 680.

As previously discussed, the Restrictive Covenant was created to benefit BP as the refiner and ultimate supplier of its branded gasoline. Because the Restrictive Covenant continues to benefit BP in this role, it is unaffected by BP's decision to

15

change its distribution scheme.  Regardless of whether BP supplies the Haygood Station directly or whether it sells through Miller Oil, BP receives the same benefit.  In either mode of distribution, BP refines and supplies all of its branded gasoline resold at this location.

The Court will not strip non-party Miller Oil of its contractual rights to atone for Double Diamond's decision to waive the contingency that Mr. Thomas inserted into the Canal/Double Diamond Purchase Agreement.  That contingency allowed Double Diamond to delay its purchase of the Haygood Station until it secured a written commitment for BP gasoline at an agreeable price.  By not doing so, plaintiffs became the architects of the problem about which they complain.  Plaintiffs cannot rely upon Mr. Thomas' hasty business decision to claim a change in circumstance that divests a third party of the exclusive supply rights it purchased for substantial consideration.

## IV.  Conclusion

For the reasons stated above, the Court has entered a separate Order (Docket No. 45) granting defendant BP's Motion for Summary Judgment (Docket No. 31) and denying plaintiffs Double Diamond's and Cypress Point's Cross-Motion for Partial Summary Judgment (Docket No. 34).

The Clerk is **DIRECTED** to forward a copy of this Opinion to all counsel of record.

**IT IS SO ORDERED.**

<div style="text-align: right">
/s/<br>
Walter D. Kelley, Jr.<br>
UNITED STATES DISTRICT JUDGE
</div>

Norfolk, Virginia
May 11, 2007